IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

**MARION E. HANKINS, PEGGY D.**                                                          **PLAINTIFFS**
**HANKINS, and JAMES F. HANKINS**

v.                                                                                                        Civil Action No. 3:08-cv-639-CWR-FKB

**FORD MOTOR COMPANY**                                                                    **DEFENDANTS**
**and JOHN DOES 1-5**

## ORDER

Pending before the Court is Ford Motor Company's motion to exclude the testimony of Stephen Batzer and Thomas Feaheny, two of the plaintiffs' experts. Docket No. 218. The plaintiffs (together, "Hankins") oppose the motion, Docket No. 233, and Ford has replied, Docket No. 248.

I.     *Background*

On October 19, 2005, Marion Hankins was involved in a single-vehicle accident on Highway 49 in Yazoo County, Mississippi. The cause of the accident is unknown, but the available evidence indicates that her vehicle, a 2000 Ford Expedition, veered or was steered left, right, and left again, and then rolled several times. Hankins was ejected through the sunroof and suffered severe injuries. She and her family brought suit against Ford alleging that the sunroof was defective and that Ford failed to warn them of the danger it posed, among other theories of liability.

II.    *The Expert Opinions*

    A.     Stephen Batzer

Batzer opines that the sunroof glass and assembly in the 2000 Ford Expedition were defective and unreasonably dangerous. Docket No. 218-3, at 15. Specifically, he claims that the sunroof glass should have had laminated glazing like the windshield. *Id.* at 12-13. Use of that glass, "coupled with an appropriate design of the associated glazing system components," such as the brackets supporting the sunroof glass, could have better kept passengers inside the vehicle during rollover accidents, he asserts, and was technologically and economically feasible when the vehicle was manufactured. *Id.* at 15; Docket No. 218-4, at 67. He has put forward six feasible design alternatives. Docket No. 233-4, at 95-100.

Ford argues that Batzer's opinions lack scientific support and are speculative. Docket No. 218, at 2. It claims that Batzer's opinion must be excluded because he has never seen the subject

sunroof – which went missing after the accident – or tested any Ford Expedition sunroof. Docket No. 219, at 2-3. Ford's central challenge, though, is to Batzer's opinions and deposition testimony regarding feasible design alternatives:

> He could not identify a single sunroof design that he thinks is reasonably safe; he could not identify a single automobile manufacturer in 1999 or 2000 that used any of his proposed alternative sunroof designs; he only tested one of his alternative designs, and did so under dramatically different conditions; he did not determine the cost of incorporating any of his proposed designs; and he did not consider the effect the designs would have on the sunroof's utility or desirability. In short, Batzer's proposed sunroof designs are merely untested concepts that Batzer thinks would provide an undefined increase in occupant retention.

*Id.* at 3.

Hankins disputes that these feasible design alternative arguments are properly brought in a *Daubert* motion, claiming instead that they are matters for summary judgment. Docket No. 234, at 9-10. She contends that Batzer identified feasible design alternatives that exist in the marketplace, conducted sufficient testing, was not required to test every possible alternative design, and did not need to provide a specific cost of the designs. *Id.* at 10-11, 15-16.

In its rebuttal, Ford clarifies that its arguments on feasible design alternatives go toward the reliability of Batzer's opinions, thereby implying that it is not seeking summary judgment on the claims. Docket No. 248, at 11-13.

### B. Thomas Feaheny

Feaheny, a former Ford executive, opines that the sunroof glass and support system was defectively designed and unreasonably dangerous, and that Ford has known for decades about the dangers of sunroof ejections through tempered glass. Docket No. 218-6, at 2, 4. He claims that use of "adequately supported" laminated glass in the sunroof was technologically and economically feasible, would have prevented Hankins' ejection, and would not have reduced the utility of the sunroof. *Id.* at 4.

Ford contends that Feaheny's testimony must be excluded because he lacks personal knowledge of the subject accident and vehicle, including whether the sunroof shattered, where the sunroof cover was positioned, and whether the glass was tinted or coated. Docket No. 219, at 15. It claims that Feaheny's opinion is full of unreliable and unsupported conclusions. *Id.* at 15-16. Ford also argues that Feaheny must be excluded because he conducted no testing on his three

2

feasible design alternatives and because they are not sufficiently specific. *Id.* at 17-18.

Hankins responds that Feaheny's opinion is sufficiently based upon others' inspections of the subject vehicle and scene, and his own experience at Ford. Docket No. 234, at 26-29. She denies that a personal site visit is necessary for expert testimony to be reliable. *Id.* Regarding the feasible design alternatives, Hankins argues that personal testing is also not required to survive *Daubert* as long as the expert has sufficient knowledge of reliable tests, then cites Feaheny's deposition testimony to list the various tests with which he is familiar. *Id.* at 30-31. To the extent the designs are allegedly not detailed enough, she claims this goes to weight of Feaheny's testimony, not its admissibility. *Id.* at 32-34.

III.     *Standard of Review*

The admissibility of expert testimony is governed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the post-*Daubert* amendments to Rule 702. *See Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). That Rule now states that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The purpose of the Rule is to guide the district court's gatekeeping function, helping it ensure that the jury hears expert testimony that is reliable and relevant. *See Guy*, 394 F.3d at 325. "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid. Relevance depends upon whether that reasoning or methodology properly can be applied to the facts in issue." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quotation marks, citations, and brackets omitted); *see United States v. Fields*, 483 F.3d 313, 342 (5th Cir. 2007). The party offering the expert bears the burden of establishing reliability by a preponderance of the evidence. *Moore v. Ashland Chem. Inc*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

In *Daubert*, the Supreme Court described several non-exclusive factors that trial judges

should consider in gauging reliability, including whether the proposed technique or theory can be or has been tested, whether it has been subjected to peer review and publication, whether its error rate is acceptable, whether the theory is generally accepted in the scientific community, and whether there are standards controlling the technique. *See Guy*, 394 F.3d at 325; *Knight*, 482 F.3d at 351. It later instructed that "the reliability analysis must remain flexible: not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy*, 394 F.3d at 325 (citation omitted); *see Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

The *Daubert* analysis applies to the process of the expert's conclusions, not the merits of the conclusions themselves. *Id.* The merits remain subject to attack at trial under our traditional principles of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. "[I]n determining the admissibility of expert testimony, the district court should approach its task with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quotation marks and citation omitted).

The Fifth Circuit has quoted with approval the Seventh Circuit's observation that "[u]nder the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Moore*, 151 F.3d at 278 (quotation marks and citation omitted). The extrapolation or "leap[] from an accepted scientific premise to an unsupported one . . . must be reasonable and scientifically valid." *Id.* at 279 (citations omitted).

IV.   *Discussion*

    A.   *Stephen Batzer*

It is not genuinely disputed that Batzer is "a witness qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. In fact, one of the exhibits Ford relies upon most heavily is an Order from another Judge in this Court concluding that Batzer is qualified to be an expert "in the area of laminated glazing and other window systems." Docket No. 218-5, at 4 (Jordan, J.). Hankins has produced similar orders from other cases. *E.g.*, *Stewart v. Ford Motor Co.*, No. 3-06-cv-2311, slip op. at 8 (N.D. Tex. Sept. 3, 2009) ("there is no dispute as to Dr. Batzer's impressive qualifications"). Having reviewed Batzer's education, experience, and publications, the

Court finds him to be well-qualified in the areas of window glazing systems and rollover crashworthiness.  *See* Docket No. 218-2.

Ford argues that Batzer's opinions are not worthy of credence because they rely upon the sunroof glass having shattered, but the available deposition testimony suggests a dispute about whether or not this is true.  On one hand, Fred Saxton, who towed the vehicle from the scene of the accident, testified that the sunroof glass "was busted all to pieces, and the tint of the sunroof was what was holding the glass together . . . . [The tint] was kind of holding it together from just shattering."  Docket No. 218-1, at 4.  On the other hand, EMT Sam Dobbins testified that the sunroof looked "like broken glass," then said, "I don't believe it was whole."  Docket No. 178-4, at 29.  Bentonia Fire Chief Edward Ferrell stated that while there was "busted glass around the vehicle," the sunroof glass "was shattered but still pretty well in one piece."  Docket No. 233-8, at 11.  Regardless, an expert's knowledge of the specifics of a crash "go primarily to the weight, not the reliability, of his opinions."  *Betts v. General Motors Corp.*, No. 3:04-cv-169, 2008 WL 2789524, *6 (N.D. Miss. July 16, 2008).  This can be explored at trial.

Ford's briefing highlights a case from this District in which Judge Jordan found Batzer's proposed testimony insufficient under *Daubert*.  *See* Order in *Vaughn v. Kia Motors America, Inc.*, No. 3:05-cv-38 (S.D. Miss. Jan. 11, 2007), *available at* Docket No. 218-5.  While there are similarities between the cases, the most significant ground for that Court's ruling was its conclusion that Batzer never settled on a feasible design alternative: because his testimony continued to evolve over time, it did "not reflect a sound methodology or a reliable opinion."  *Id.* at 6.  In contrast, here Batzer has specifically outlined six feasible design alternatives.  *See Betts*, 2008 WL 2789524, at *8 ("In response to Judge Jordan's concerns in *Vaughn*, Dr. Batzer has authored a meticulous and comprehensive alternative design report which details each of his specific proposals and identifies certain vehicles which contain his alternative designs.").

Next, Ford argues that Batzer performed insufficient testing to support his opinions and that they are mere concepts.  But "there is no requirement that the expert actually design, produce, and test their proposed design on the specific product at issue."  *Id.* (citing *Guy*, 394 F.3d at 327). "Reliance upon industry knowledge and testing, patents, and other such information is sufficient in determining whether certain automotive roof and door designs are feasible alternatives."  *Id.* (citation omitted); *see also Egbert v. Nissan North America*, No. 2:04-cv-551, 2006 WL 6503320,

5

\*3 (D. Utah Mar. 1, 2006) ("In [Nissan's] view, if the court understands the argument correctly, Dr. Batzer would apparently need to build from scratch several new, prototype Nissan Altimas with a new side window system and then test them in rollover accidents before his conclusions could be considered reliable. *Daubert* does not require this much.").

Here, Batzer's conclusions are based upon relevant articles, NHTSA tests, and his own tests. Ford has not challenged the validity of the underlying NHTSA tests, *see General Elec. Co. v. Joiner*, 522 U.S. 136, 143-46 (1997), and has argued that Batzer's own testing is irrelevant to the present vehicle and facts. That goes to the weight of his testimony, not whether his opinions are sufficiently reliable, testable, and based on the scientific method.

Moreover, Batzer's report contains a detailed, onsite inspection of Hankins' vehicle, including the glazing and sunroof system; a comparison to an intact 2001 Ford Expedition sunroof; a list of his conclusions, and citations to articles and other sources supporting those conclusions. When his testimony is viewed in light of his extensive experience, publications, and knowledge base, including experience in several prior Ford Expedition cases [*see* Docket No. 218-4, at 18], it is sufficiently reliable, relevant, and helpful to the jury to survive the *Daubert* challenge.

Finally, *Daubert* did not purport to modify or eliminate the district court's role in keeping irrelevant evidence from the jury. Ford argues that Batzer's sixth design alternative, which recommends using a stronger sunroof cover, is irrelevant to this case because there is testimony indicating that Hankins never used the sunroof cover. Docket No. 219, at 13. Ford's brief, though, did not point out where that testimony is contained in the record. Ford may re-urge its objection at an appropriate time at trial.

  B.  Thomas Feaheny

It is not disputed that Feaheny is qualified to be an expert in this case. He worked for Ford for 26 years, rising from engineer to Vice President of Vehicle Research, where he was responsible for Ford's worldwide research for both cars and trucks. Docket No. 218-6, at 1-2. While at Ford he reviewed several tests of glazing materials in which Ford sought to reduce occupant injuries. Docket No. 218-7, at 17-18. He has testified as an expert in a host of federal and state courts across the country. Docket No. 233-24, at 15-16.

For the same reasons already articulated regarding Batzer, Ford's *Daubert* challenge will be rejected. Feaheny was not required to inspect the accident site or Hankins' vehicle, nor was he

required to test his feasible design alternatives. His conclusion is not drawn out of thin air, but instead based upon the accident reconstruction reports and other case-specific information, combined with years of experience in this field and knowledge of the research on this subject matter at the defendant's own company. *See Tunica Web Advertising, Inc. v. Barden Mississippi Gaming, LLC*, No. 2:03-cv-234, 2008 WL 3833217, *2 (N.D. Miss. Aug. 14, 2008) (finding accountant's expert testimony regarding damages admissible where his opinion was based, in part, "on his review of numerous documents and depositions, his knowledge, and his application of appropriate accounting principles" to the facts). His testimony is reliable, relevant, and will be helpful to the jury.

V.    *Conclusion*

Batzer and Feaheny's testimony is sufficiently reliable and relevant to survive the *Daubert* challenge. Most of Ford's arguments go to weight, not admissibility. That said, Ford will be able to make some very strong arguments to the jury, the proper audience for these arguments. *See Tunica Web Advertising, Inc. v. Barden Mississippi Gaming, LLC.*, No. 2:03-cv-234, 2007 WL 2768914, *5 (N.D. Miss. Sept. 18, 2007). The motion to exclude Batzer and Feaheny [Docket No. 218] is denied, as is the request for a *Daubert* hearing.

SO ORDERED, this the 5th day of December, 2011.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE