IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

**MARION E. HANKINS, PEGGY D().**                                             **PLAINTIFFS**
**HANKINS, and JAMES F. HANKINS**

v.                                                                                     Civil Action No. 3:08-cv-639-CWR-FKB

**FORD MOTOR COMPANY**                                                   **DEFENDANTS**
**and JOHN DOES 1-5**

**ORDER**

Pending before the Court is Ford Motor Company's motion for summary judgment on a variety of the plaintiffs' claims. Docket No. 222. The plaintiffs (together, "Hankins," except where otherwise indicated) oppose the motion. Docket No. 237. Ford has replied, Docket No. 249, and Hankins has moved for leave to file a sur-response, Docket No. 251.

**I.**    *Background*

On October 19, 2005, Marion Hankins was involved in a single-vehicle accident on Highway 49 in Yazoo County, Mississippi. The cause of the accident is unknown, but the available evidence indicates that her vehicle, a 2000 Ford Expedition, veered or was steered left, right, and left again, and then rolled several times. Hankins was ejected through the sunroof and suffered severe injuries. She and her family brought suit against Ford alleging that the sunroof was defective and that Ford failed to warn them of the danger it posed, among other theories of liability.

**II.**    *Discussion*

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking to avoid summary judgment must identify admissible evidence in the record showing a fact dispute. *Id.* at 56(c)(1)-(2). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 164 (5th Cir. 2006) (citation omitted). The Court must "view the evidence and draw reasonable inferences in the light most favorable to the non-movant." *Maddox v. Townsend and Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011) (citation omitted).

In this diversity case, the Court applies the substantive law of Mississippi. *Capital City Ins.*

*Co. v. Hurst*, 632 F.3d 898, 902 (5th Cir. 2011); *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 228 (5th Cir. 2007).  State law is determined by looking to the decisions of the state's highest court.  *St. Paul Fire and Marine Ins. Co. v. Convalescent Services, Inc.*, 193 F.3d 340, 342 (5th Cir. 1999).

The claims are addressed in the order argued by Ford.

*A.     The Sunroof Claim*

Ford argues that the sunroof was not defective because it functioned as expected.  Docket No. 223, at 4-8.  It contends that "[o]rdinary consumers do not expect sunroofs to serve as a restraint in a rollover event," and quotes Judge Posner's view that such an expectation "has elements of fantasy."  *Id.* at 4 (citation omitted).  Ford claims consumer expectation is an objective measure that Hankins has failed to establish.  *Id.* at 5.  It also argues that the sunroof claim fails if Hankins' design defect experts are excluded, which was the subject of a prior motion.  *Id.* at 8-9; *see* Docket No. 218.

Hankins responds that Judge Posner's view is based on different evidence in a different jurisdiction.  Docket No. 238, at 3-4.  She claims that in Mississippi, the jury decides what reasonable consumers would expect from products.  *Id.* at 4-5.  Hankins then argues that she has presented evidence to satisfy that objective test, based on her experts' testimony, her family's testimony, and Ford's internal documents.  *Id.* at 5-10.

The Mississippi Products Liability Act ("MPLA") requires Hankins to prove that "[t]he product failed to function as expected."  Miss. Code § 11-1-63(f)(ii).  "The Act created a hodge podge mixture of the consumer expectations and risk [utility] tests[] for a manufacturer or seller to pass in order to obtain protection if the product causes harm."  *Green v. Allendale Planting Co.*, 954 So. 2d 1032, 1040 (Miss. 2007) (quotation marks and citation omitted).

Perhaps obviously, in design defect cases the plaintiff must first prove that the product failed to function as the plaintiff expected.  *Clark v. Brass Eagle, Inc.*, 866 So. 2d 456, 461-62 (Miss. 2004).  Ford argues, and Hankins does not dispute, that the plaintiff must also prove that ordinary, reasonable consumers would conclude that the product failed to function as expected.  *See* Docket Nos. 223, at 5; 238, at 5; *see also* Docket No. 1, at 4 (Hankins' claim that the vehicle "did not meet the expectations of the ordinary consumer, including the Plaintiffs"); *Moss v. Batesville Casket Co., Inc.*, 935 So. 2d 393, 405 (Miss. 2006) ("Clearly, it is obvious that an ordinary person would not expect an interred wooden casket to last forever.").  Unless the plaintiff's case is so flawed as to

2

"obvious[ly]" have no possible chance of success, *Moss*, 935 So. 2d at 405, the jury is the ultimate arbiter of consumer expectations. *E.g.*, *Betts v. General Motors Corp.*, No. 3:04-cv-169, 2008 WL 2789524, at *15 (N.D. Miss. July 16, 2008).

Ford relies heavily upon a Mississippi Court of Appeals case in which a plaintiff sued a manufacturer of automatic garage door openers. *Glenn v. Overhead Door Corp.*, 935 So. 2d 1074 (Miss. App. 2006). The plaintiff claimed that the opener was defective because it lacked a carbon monoxide sensor and therefore permitted deadly fumes to collect in a closed garage. *Id.* at 1078. The Court of Appeals affirmed summary judgment for the manufacturer for several reasons. One reason was evidence that the opener functioned as the plaintiff expected. *Id.* at 1081. Another reason was the court's conclusion that "no reasonable person could expect that a garage door opener with no carbon monoxide detector would raise the door when the carbon monoxide reached a toxic level." *Id.* at 1082. Ford claims that this is the "most analogous Mississippi decision" to Hankins' case. Docket No. 249, at 4.

Here, though, members of the Hankins family have testified that they did not expect the sunroof glass to come out in a rollover accident and leave room for a passenger to be ejected. Docket No. 237-6. Hankins' expert Laux confirmed that "people don't -- won't . . . understand that tempered glass will fall out and create an open window through which they can be ejected." Docket No. 237-4, at 48-49; *see also* Docket No. 235-5, at 9-10 (Laux's opinion surmising that had ordinary consumers like the Hankins' been provided with the proper information they could have made "an informed decision about whether to purchase the Expedition with tempered glass windows and a sun roof, and whether or not to replace the tempered glass windows with alternative glazing"). Finally, a reasonable person may believe that sunroof glass will retain occupants in car crashes, since windshield glass already does that very thing. Although "consumers ha[ve] no right to expect crashworthiness to be enhanced by a technology . . . known to be non-existent in the vehicle," they may expect crashworthiness to be enhanced by a technology known to be present in the vehicle. *Betts*, 2008 WL 2789524, at *15 (citing *Cooper v. General Motors Corp.*, 702 So. 2d 428, 443 (Miss. 1997)).

Nor is Ford's citation to the Seventh Circuit controlling or persuasive. *See Barron v. Ford Motor Co. of Canada Ltd.*, 965 F.2d 195 (7th Cir. 1992). One problem is that Ford raises *Barron* to argue for summary judgment, but that case went to a jury, which, incidentally, found in favor of

3

Ford. *Id.* at 197. Another is the evidence here supporting that the concept of retention by sunroof is not a fantasy at all; in fact, Ford's internal documents from the late 1960s and early 1970s discuss the superiority of laminated glass over tempered glass in "restraining the occupant . . . and minimizing ejection" in crashes and rollover accidents. *See* Docket Nos. 237-8; 237-9.

Although the evidence is not overwhelming, there is a disputed factual matter regarding whether ordinary, reasonable consumers would expect sunroof glass to contain an occupant in a rollover accident. *See Betts*, 2008 WL 2789524, at *15 (denying summary judgment on General Motors' argument that side glass that was broken in an accident functioned as expected, concluding that the issue was "debatable"). The basic question may be whether ordinary consumers expect sunroof glass to function like a windshield or function like a window. The jury will have to use its common sense and judgment, as informed by the evidence, the competing opinions, and the Court's final instructions, to provide an answer.

Finally, Ford's alternative argument for summary judgment is no longer applicable because the Court has entered an Order permitting Hankins' sunroof experts to testify. Docket No. 290.[1]

## B. The Claims of Mr. & Mrs. Hankins

Ford argues that Marion Hankins' parents have no claims because their daughter was an adult at the time this suit was filed. Docket No. 223, at 9-10. Hankins agrees that her parents cannot pursue a derivative loss of consortium claim, Docket No. 238, at 13-16, but contends that they can recover their direct financial losses, such as medical expenses, *id.* at 13-14. She also requests that this Court expand Mississippi law to allow parents to recover loss of consortium for a child's non-fatal injuries. *Id.* at 15-16. Ford's rebuttal brief challenges any expansion of loss of consortium, but does not explain why parents may not recover direct losses incurred relating to a child's injuries. Docket No. 249, at 8-9.

The Court concludes that Hankins' parents cannot recover for loss of filial consortium. That is a question left to the state legislature. *See Thompson v. Love*, 661 So. 2d 1131, 1132 (Miss. 1995).

Nevertheless, there is no genuine dispute that Hankins' parents incurred medical expenses

---

[1] In its rebuttal, Ford adds an argument that its compliance with industry and governmental standards supports that its sunroof design met the expectations of ordinary consumers. Docket No. 249, at 5-6. Its supporting cases, though, indicate that this point is neither "conclusive" nor "dispositive." *Id.* at 5 (citations omitted). Ford may present this argument and evidence to the jury. Hankins' motion for leave to file a sur-response addressing this issue [Docket No. 251] is granted.

which are recoverable from the date of the subject accident until Marion Hankins turned 21, the age of majority in Mississippi.  *See* Miss. Code § 1-3-27.

> [U]nder Mississippi law, recovery for medical expenses associated with a child's injuries are properly recoverable by the parents; thus in state court, a claim for such expenses properly belongs to the parents.  Double recovery would not be allowed for past and future medical expenses.  Either Ernie or his parents would be allowed to recover medical expenses.

*Cook v. Children's Medical Group, P.A.*, 756 So. 2d 734, 740 (Miss. 1999) (citations omitted). "This rule permits these issues to be decided in one suit rather than two." *Lane v. Webb*, 220 So. 2d 281, 286 (Miss. 1969).

Applying these authorities, Hankins' parents may submit evidence of their direct (past) medical expenses.  Marion Hankins may then introduce evidence regarding future medical expenses, but double recovery will obviously not be allowed.  *See Cook*, 756 So. 2d at 740.

### C. The Warranty Claims

Ford argues that Hankins may not pursue her warranty claims because they fall inside the MPLA, are time-barred, or otherwise fail as a matter of law.  Docket No. 223, at 10-11.  Hankins concedes her warranty claims.  Docket No. 238, at 19.  Ford will be granted summary judgment on these claims.

### D. The Negligence Claims

Ford argues that Hankins' negligence claims are subsumed in or abrogated by the MPLA. Docket No. 223, at 11.  Hankins denies that the MPLA is her exclusive remedy and seeks to present both negligence and strict liability theories at trial.  Docket No. 238, at 11-13.  Ford replies that such a presentation would be redundant and would make the MPLA irrelevant.  Docket No. 249, at 7.

Hankins relies upon a Mississippi Supreme Court ruling which found "no statutory requirement that makes the MPLA the exclusive remedy for claims of malfunctioning automobiles." *Watson Quality Ford, Inc. v. Casanova*, 999 So. 2d 830, 833 (Miss. 2008).  In that case, however, there was no negligence claim remaining against Ford as manufacturer (*i.e.*, for negligent design of the vehicle); it was a claim of negligent repair against a Ford dealership.  *Id.* at 833, 835.  The Mississippi Supreme Court could have been ruling that a negligent repair claim against a dealership could co-exist with warranty and design defect claims against a manufacturer – not that a negligence claim against a manufacturer based on the same facts as a design defect claim could survive.  *See*

5

*id.* at 833.[2] The federal case Hankins relies upon did not address this distinction. *See Kerr v. Phillip Morris USA, Inc.*, No. 1:09-cv-482, 2010 WL 1177311, *3 (S.D. Miss. Mar. 25, 2010).

A leading treatise has speculated that the confusion stemming from the Mississippi Supreme Court's decisions on this topic means "a plaintiff who is unable to demonstrate a feasible design alternative or to meet one of the other MPLA requirements would be able to circumvent the statute by simply proceeding under an implied warranty or possibly even a common law negligence theory," rendering the MPLA "an exercise in futility and irrelevancy in many cases." Weems & Weems, Mississippi Law of Torts § 15:3, at 289 (2d ed. 2008) [hereinafter Weems]; *see also id.* § 15:34, at 323-25. But it would be illogical to make meaningless the MPLA's exacting requirements.

A critical case in this area is from the Mississippi Court of Appeals, which in 2003 affirmed a directed verdict on a plaintiff's negligent design and negligent failure to warn claims. *Palmer v. Volkswagen of America, Inc.*, 905 So. 2d 564, 599 (Miss. App. 2003). The trial court concluded that those causes of action were redundant because it was submitting to the jury the plaintiff's MPLA defective design and failure to warn claims. *Id.* In affirming, the Court of Appeals held that "when a plaintiff claims defective design under the MPLA, a jury instruction on negligence is not necessary." *Id.* at 600 (citing *Hunter v. General Motors Corp.*, 729 So. 2d 1264, 1277-78 (Miss. 1999)). It continued,

> because the risk-utility test [in the MPLA] requires the jury to reach a conclusion about the manufacturer's conduct, the test is a version of Judge Learned Hand's negligence calculus. Therefore, . . . a jury performing risk-utility analysis necessarily makes a negligence determination. The jury need only be instructed on a single unified theory of negligent design. In the case *sub judice*, the jury was properly instructed on the Palmers' claim of design defect under the MPLA, and additional negligence instructions would have been redundant.

---

[2] While Ford's motion for summary judgment was pending with this Court, the Mississippi Supreme Court released a draft opinion rejecting the argument "that the MPLA abrogates all common-law claims of negligence for defective products, even those asserted against nonmanufacturers." *Lawson v. Honeywell Int'l, Inc.*, --- So.3d ----, 2011 WL 5027139, *4 (Miss. Oct. 20, 2011). The opinion also supported distinguishing between manufacturers and non-manufacturers, as follows:

> Interpreting the MPLA as a whole reveals that claims against nonmanufacturing and nonselling designers are outside the scope of the statute. The MPLA addresses what plaintiffs must prove to hold "manufacturers" and "sellers" liable for damages caused by a product. . . . We hold that the MPLA does not preclude common-law negligence claims against nonmanufacturing designers who do not fall under the purview of the statute.

*Id.* at *4-5. While *Lawson* may ultimately bolster this Court's interpretation of *Casanova*, it is given little weight today because it remains subject to revision or withdrawal by the Mississippi Supreme Court.

*Id.* (quotation marks, citations, and brackets omitted).[3]  This reasoning is also true for a MPLA failure to warn claim.  *Id.*; *see Bennett v. Madakasira,* 821 So. 2d 794, 804 (Miss. 2002) ("Although a plaintiff in a prescription drug liability case may alternatively rely on strict liability and negligence principles, these principles merge into one inquiry; the adequacy of the defendant's warnings.") (quotation marks and citations omitted).  *Palmer* may be the most on-point authority in state law directly addressing our issue.

Mississippi's federal Judges appear to be divided on this issue.  In 2009, visiting District Judge O'Malley provided a partial breakdown of where our District Judges fall, citing several federal decisions that allowed negligence and MPLA claims to stand in one action.  *Jowers v. BOC Group, Inc.*, No. 1:08-cv-36, 2009 WL 995613, *2 (S.D. Miss. Apr. 14, 2009) (O'Malley, J.) (collecting cases), *aff'd in part, vacated in part on other grounds, and remanded*, *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346 (5th Cir. 2010).  She first noted that most of these decisions predated the 2003 *Palmer* case, *id.* at 2 n.8, then ruled as follows:

> It is true that in neither *Bennett* nor *King* has the Mississippi Supreme Court stated explicitly and precisely whether the MPLA still permits (or does not abrogate) common law negligence claims in product liability cases.  The undersigned believes, however, that the greater weight of the somewhat-mixed authority holds that negligence-based claims *of product defect* are abrogated by the MPLA. . . .
>
> Ultimately, it makes little difference . . . .  The analysis the jurors must undertake once they begin deliberation is the same, and the evidence upon which they must base their conclusion will also be the same.
>
> Accordingly, the Court will grant defendants' motion for summary judgment on Jowers' common law negligence claims.

*Id.* at *4; *see also Betts*, 2008 WL 2789524, at *16 ("The MPLA notwithstanding, the Supreme Court of Mississippi has held that it does not constitute reversible error for a court to refuse to instruct a jury as to both negligence and as to a defective design theory under the risk-utility standard.  For these reasons, plaintiffs' negligence claims will be dismissed.") (citation omitted); *McSwain v. Sunrise Medical, Inc.,* 689 F. Supp. 2d 835, 846 (S.D. Miss. 2010) ("while negligence claims can be brought alongside strict liability claims, the findings for the claims brought under the

---

[3] While *Palmer* was later taken up by the Mississippi Supreme Court, that court declined to disturb the trial court's ruling on directed verdict that matters to us today.  *See Jowers v. BOC Group, Inc.*, No. 1:08-cv-36, 2009 WL 995613, *2 n.7 (S.D. Miss. Apr. 14, 2009) (O'Malley, J.) (citation omitted), *aff'd in part, vacated in part on other grounds, and remanded*, *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346 (5th Cir. 2010).

MPLA can be dispositive as to the product-based negligence claims such as negligent failure to warn and negligent design."); *Richardson v. West-ward Pharmaceuticals, Inc.*, No. 5:09-cv-167, 2010 WL 3879541, *2 (S.D. Miss. Sept. 28, 2010) ("This Court concurs [with *McSwain*], and finds that while a negligence claim might be redundant in light of the MPLA, there is no clear indication that the Mississippi Supreme Court would find negligence claims abrogated by the statute.") (citation omitted).

Returning to the present case, on these facts the Court agrees with Ford that there is nothing distinct about Hankins' negligence-based claims requiring separate causes of action or unique jury instructions. Unlike the plaintiff in *Casanova*, she has no negligent repair claim against her dealership, but instead seeks to advance under another banner a design defect claim against the manufacturer. The caselaw cited above supports rejecting these duplicative negligence-based causes of action.[4] Ford will be granted summary judgment on Hankins' negligent design and negligent failure to warn claims.

### E. The Crashworthiness Claim

Ford argues that Hankins' crashworthiness claim is vague and fails for the lack of expert testimony. Docket No. 223, at 11-12. Hankins responds that the claim was properly made and is supported by Batzer's opinions. Docket No. 238, at 16-17. She also contends that she designated both Batzer and Feaheny as crashworthiness experts. *Id.* at 17. On rebuttal, Ford reframes the argument somewhat, asserting that Hankins' crashworthiness claim is simply a restatement of her sunroof and warning claims. "They cannot seriously contend that if their sunroof and warning claims were dismissed, that some amorphous crashworthiness claim would still survive." Docket No. 249, at 8.

A crashworthiness claim arises when a vehicle defect did not cause the accident, but rather "proximately caused or enhanced" the plaintiff's injuries. Weems § 15:45, at 333. "The crashworthiness doctrine proceeds from the belief that a manufacturer has a duty to minimize the injurious effects of a crash, no matter how the crash is caused." *Id.*

---

[4] Although this Court gives little weight to *Lawson*, it cannot ignore two salient points presented in that unanimous opinion: (1) "the MPLA does not preclude claims against defendants who are neither manufacturers nor sellers, as those terms are understood in the statute," *Lawson*, 2011 WL 5027139, at *5; and (2) *Jowers* and other cases construing the MPLA similarly should be interpreted as denying duplicative negligence claims against a manufacturer or seller.

In her complaint, Hankins alleged that her vehicle was defective and unreasonably dangerous for its "lack of overall crashworthiness." Docket No. 1, at 4; *see also* Docket No. 238, at 16 (describing a "general lack of crashworthiness"). Now, at the summary judgment stage, it is not clear what that means outside of the sunroof defect. The sunroof failure did not cause the accident, but it is alleged to have caused or enhanced Hankins' injuries.

Hankins attempts to support her crashworthiness theory by pointing to the expert opinion of Batzer. But that opinion describes crashworthiness in terms of the sunroof claim. Docket No. 237-15, at 13-15. Without more, the Court concludes that Hankins' crashworthiness claim is indeed one and the same as her sunroof design defect claim. To the extent they are distinct, Ford is granted summary judgment on the crashworthiness theory.

### F. The Seatbelt Claim

Ford argues that Hankins' seatbelt claim fails for the lack of expert testimony. Docket No. 223, at 11-12. Hankins concedes the claim, but seeks to reserve the right to refute Ford's defenses predicated on her alleged failure to wear her seatbelt. Docket No. 238, at 19. Ford responds that this is a "not-so-subtle attempt to backdoor a seatbelt defect claim" that "should not be tolerated by the Court and will be the subject of a separate motion *in limine*." Docket No. 249, at 10.

Summary judgment will be granted on the seatbelt claim. The Court will defer its ruling on the evidentiary issue and take it up when ruling on the pending motion *in limine*.

### III. Conclusion

Ford's motion for summary judgment [Docket No. 222] is granted in part and denied in part. Hankins' motion for leave to file a sur-response [Docket No. 251] is granted.

SO ORDERED, this the 13th day of December, 2011.

                                          s/ Carlton W. Reeves
                                          UNITED STATES DISTRICT JUDGE